FILED'10 FEB 09 08:55 USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**PAMELA ANN KEYSER,**

  Plaintiff,

    v.

**MICHAEL J. ASTRUE**, Commissioner,
Social Security Commission,

  Defendant.

Civil No. 08-1268-CL

**Report & Recommendation**

CLARKE, Magistrate Judge.

  Plaintiff Pamela Ann Keyser ("Plaintiff") brings this action pursuant to 42 U.S.C. §
405(g) to obtain judicial review of the Commissioner's final decision denying Plaintiff's claim
for Social Security Disability Insurance ("SSD") benefits and Supplemental Security Income
("SSI") disability benefits.  For the several reasons set forth below, the decision of the
Commissioner should be affirmed.

Report & Recommendation - 1

## I.    Background

Plaintiff alleges disability beginning October 31, 2005, based on combined impairments including bullous emphysema, depression, anxiety, and bipolar disorder. (Tr. 124.)  Plaintiff was born in 1957, and was 50 years old at the time of the ALJ's decision.  She attended school through the twelfth grade but did not graduate.  (Tr. 26; Pl.'s Br. 2.)

Plaintiff's work history includes a cashier, a position at a furniture store, and a waitress. Most recently she was employed as a cashier, a job which she held for approximately 15 years. (Tr. 11.)  Plaintiff left this position on October 31, 2005, when her lung collapsed.

On July 21, 2005, a chest x-ray showed that she had emphysematous lung disease.  (Tr. 12.)  After her lung collapsed that October, she was admitted to the hospital with a spontaneous pneumothorax (collapsed lung) and released eight days later on November 8, 2005.  While in the hospital she had a thoracoscopic bleb resection performed.  (Tr. 12.)  Plaintiff's surgeon Dr. Edward Boyle noted at discharge that her pain was well controlled.  Her treating physician Dr. Knapp restricted her from working for four to six weeks.  (Tr. 12.)

In November 2005, Plaintiff saw Dr. Knapp and complained primarily of anger and stress.  Dr. Knapp diagnosed her with situational stress and generalized anxiety disorder.  (Tr. 12.)  On December 5, 2005,  he restricted her from work for another four to six weeks.  (Tr. 12.) Three days later, Plaintiff returned to Dr. Knapp who then recommended a decrease in her narcotic medication.  He also stated, "[Plaintiff] certainly should qualify for" disability benefits. (Tr. 12.)

Dr. Boyle saw Plaintiff on December 7, 2005, for post-operative treatment.  He believed that her anxiety was causing more difficulty for her than the residual pain from her November

Report & Recommendation - 2

thoracoscopic procedure.  (Tr 13.)  He referred her to the pain management specialist Dr. Marc Jacobs.  (Tr. 13.)  Dr. Jacobs saw Plaintiff on January 11, 2006.  He believed that she was a candidate for pulmonary rehabilitation.  (Tr. 13.)

Plaintiff visited several physicians in early 2006.  Dr. Knapp saw her on January 18, 2006.  He reported that she had a stable right lower long nodule and did not have any other increased problems.  (Tr. 13.)  On January 19, 2006, Dr. Maloney noted that she had hypersensitivity along the right chest wall, her overall activity level was reduced, and she had restriction in trunk flexibility.  She also noted that Plaintiff had an altered mood state, characterized as depression and stress. (Tr. 13.)  A month later, Plaintiff reported to Dr. Maloney that her pain had improved, and she changed medications.  (Tr. 13.)  On May 17, 2006, Kristy Keller, an adult nurse practitioner at Dr. Knapp's office, noted that Plaintiff was doing well and that the pain medication was working.  Plaintiff also reported that her medication for her anxiety symptoms was working well.  (Tr. 13.)

Several doctors opined on Plaintiff's ability to work.  On May 18, 2006, Dr. Jacobs wrote a letter to Plaintiff's Social Security disability attorney.  He explained that Plaintiff had severe emphysema with significant exercise limitation and that Plaintiff would not be able to work in any kind of strenuous activity.  (Tr. 13.)

Dr. Knapp also wrote a letter on June 2, 2006, explaining that Plaintiff could not perform any work because of her severe emphysema.  He noted that she had to be hospitalized to repair an area of her lung and that there was the possibility of needing similar treatment on other areas of her lungs.  (Tr. 13.)  Also that month, Dr. Knapp determined from a chest x-ray and exam that Plaintiff's emphysema was clinically stable with no documented symptoms.  (Tr. 14.)

Report & Recommendation - 3

On November 15, 2006, Dr. Knapp provided an additional letter to Plaintiff's attorney noting that Plaintiff was suffering from severe depression and generalized anxiety disorder with panic attacks. (Tr. 14.) He concluded that based on her mental health conditions and her chronic obstructive pulmonary disease, "she is basically unable to work due to the combination of these issues." (Tr. 14.)

On December 27, 2006, Dr. Jacobs also provided an additional letter describing Plaintiff's bullous emphysema. He indicated that she was at risk for recurrent pneumothoraces based on her persist bulbous emphysema: "Given the severity of her buflous [sic] emphysema and her [prebronchodilator] FEV1 of 46% of predicted, would recommend disability." (Tr. 14.)

However, Dr. Jacobs noted in his examination report dated December 27, 2006 that Plaintiff was doing reasonably well, and, though not working, she was singing. He explained that while she had some acute bronchodilator responsiveness she wanted to use a long-acting bronchodilator. A spirometry completed at the hospital on the same date reflected that her post-bronchodilator FEV1 reading was 1.89L (72% predicted). (Tr. 14.)

In April 2007, Dr. Knapp determined that Plaintiff would benefit from a psychiatric consultation: "Pam is losing weight and [is] severely psychologically stressed now." (Tr. 14.) Plaintiff saw Dr. Monteverdi for four sessions from late May to August. He assessed Plaintiff to have bipolar disorder with some psychotic features along with some paranoid and schizotypal personality traits. (Tr. 15.) He also learned that while living in Colorado she was first diagnosed with bipolar disorder. (Tr. 15.) Her husband reported that this diagnosis was in 1995. (Tr. 55.) In May 2007, Dr. Monteverdi reported that she had varying moods, and her mood fluctuated for a period of a couple of weeks to several months. He noted that in the past six months Plaintiff had

Report & Recommendation - 4

some expansive and irritable affect, some flight of ideas, and a volatile mood. (Tr. 15; 314.) He stated, "[i]t doesn't sound as though she has such profound depressive episodes but she occasionally will get mixed episodes and it does appear that's what's she's in the midst of now as she has some mild feelings of hopelessness." (Tr. 15; 314.) She had a tangential thought process but did not have suicidal or homicidal ideation. She admitted to intermittent auditory hallucinations in the past but denied any command hallucinations. (Tr. 15; 314.) Her global assessment score was between 55 to 65. (Tr. 15; 314.)

Though medication and visits with Dr. Monteverdi appeared to help Plaintiff, this treatment was a financial strain for her, and she requested not to see him any more because of the cost. (Tr. 320.) Dr. Monteverdi assessed that overall Plaintiff had maintained stable on her medication and her bipolar disorder was in partial remission. (Tr. 321.)

Dr. Monteverdi also completed a medical source statement in October 2007 although he was not treating her at that time. He noted that she had mild limitations with most functions, but he did find moderate limitations in the following: ability to understand and remember detailed instructions, ability to maintain attention and concentration for extended periods, ability to interact appropriately with the general public or customers, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers, maintain socially appropriate behavior, and respond to unexpected changes in the work place. (Tr. 16; 343-45.)

By June 2007, Plaintiff's chest condition appeared to have stabilized. Dr. Jacobs reported on June 21 that her emphysema was clinically stable. He noted that she was not getting regular aerobic activity, but she was not having increased breathlessness, chest pain, cough or phlegm production. She continued to sing in a band. (Tr. 15.)

Report & Recommendation - 5

Plaintiff's administrative hearing was held October 30, 2007, before an Administrative Law Judge ("ALJ"). Plaintiff testified to her shortness of breath and need for breaks and naps throughout the day. She testified that doing household chores makes her sore and though she was advised to walk as far as she can, she does not do this because of shortness of breath. (Pl.'s Br. 2.) Three times a week she rehearses with a rock band. During the two-hour practice sessions, she takes at least three breaks. She testified that she sings to exercise her lungs. (Tr. 11, 49.)

Plaintiff's husband John Keyser testified about Plaintiff's mental condition. He reported that even before her lung injury, she was having problems with depression and bipolar disorder. He explained that though Plaintiff does practice with a band, she has problems with endurance that have reduced the number of times she has played. (Pl.'s Br. 3.) He also explained that due to exhaustion Plaintiff is lying down 90 percent of the time. (Pl.'s Br. 4.)

A vocational expert (VE) also testified at the hearing and explained that an individual with limitations as described by the ALJ could not perform Plaintiff's past relevant work. (Pl.'s Br. 4.) She testified that Plaintiff could perform at least two cashiering occupations that number about 1.2 million in the national economy and 43,000 in the state of Oregon. Accounting for a sit/stand option, the Oregon number is reduced to 12,696 positions. (Tr. 64.)

The ALJ issued his decision on November 30, 2007, finding Plaintiff not disabled. The Appeals Council declined review on August 28, 2008, making the ALJ's decision the final order of the agency. (Pl.'s Br. 1-2.)

## II.    Standards

This court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence in the record.  Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court considers the record as a whole and weighs "both the evidence that supports and detracts from the [Commissioner's] conclusion."  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  Where the evidence is susceptible of more than one rational interpretation, the Commissioner's conclusion must be upheld.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  Questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner, Waters v. Gardner, 452 F.2d 855, 858 n.7 (9th Cir. 1971), but any negative credibility findings must be supported by findings on the record and supported by substantial evidence.  Ceguerra v. Sec'y of Health & Human Servs., 933 F.2d 735, 738 (9th Cir. 1991).  The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive.  42 U.S.C. § 405(g).  However, even where findings are supported by substantial evidence, "the decision should be set aside if the proper legal standards were not applied in weighing the evidence and making the decision."  Flake v. Gardner, 399 F.2d 532, 540 (9th Cir. 1968); see also Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  Under sentence four of 42 U.S.C. § 405(g), the court has the power to enter, upon the pleadings and transcript record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the case for a rehearing.

Report & Recommendation - 7

### III.    Commissioner's Decision

The initial burden of proof rests upon the claimant to establish disability.  Howard v.
Heckler, 782 F.2d 1484, 1486 (9th Cir. 1986).  To meet this burden, a claimant must demonstrate
an "inability to engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which has lasted or
can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. §
423(d)(1)(A).

A five-step sequential process exists for determining whether a person is disabled.
Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether a claimant is engaged in "substantial
gainful activity."  Yuckert, 482 U.S. at 140; 20 C.F.R. §§ 404.1520(b), 416.920(b).  In the
present case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since
October 31, 2005, the alleged onset date.  (Tr. 10.)

In step two, the Commissioner determines whether the claimant has a "medically severe
impairment or combination of impairments."  If the Commissioner finds no medically severe
impairment, the claimant is deemed not disabled.  If the Commissioner finds a severe impairment
or combination thereof, the inquiry moves to step three.  Yuckert, 482 U.S. at 140-41; 20 C.F.R.
§§ 404.1520(c)), 416.920(c)).  Here, the ALJ found that Plaintiff had a severe impairment of
emphysema and a non-severe impairment of bipolar disorder in partial remission.  (Tr. 10.)
Accordingly, the inquiry moved to step three.

Step three focuses on whether the impairment or combination of impairments meets or
equals "one of a number of listed impairments that the [Commissioner] acknowledges are so

severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41; <u>see</u> 20 C.F.R. §§

404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if not, the

analysis proceeds to step four.  <u>Yuckert</u>, 482 U.S. at 141.  In this case, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that meets or equals one of

the listed impairments.  (Tr. 11.)

      In step four, the Commissioner determines whether the claimant has the residual

functional capacity (RFC) to perform her "past relevant work."  20 C.F.R. § 404.1560(a).  The

RFC is based on all relevant evidence in the case record, including the treating physician's

medical opinions about what an individual can still do despite impairments.  SSR 96-8p.  "Past

relevant work" refers to work that "was done within the last 15 years, lasted long enough for [the

claimant] to learn to do it, and was substantial gainful activity."  20 C.F.R. § 404.1565(a).  It

does not consider "off-and-on" work during that period.  <u>Id.</u>   If she can perform past relevant

work, then the Commissioner finds the claimant "not disabled."  If the claimant cannot perform

past relevant work, the inquiry advances to step five.  20 C.F.R. §§ 404.1520(e), 416.920(e).

The ALJ found that Plaintiff had the following exertional and nonexertional limitations:

> the claimant has the residual functional capacity to lift, push, or pull 10 pounds
> frequently and 20 pounds maximum; she can sit, stand, or walk up to six hours in
> an eight hour work day, though she must be able to alternate between positions;
> she has no postural or communication limitations; she should avoid even
> moderate exposure to respiratory irritants, i.e. dust, fumes, or gases; and she has
> no mental limitations.

(Tr. 11.)  The ALJ found that Plaintiff could not perform any past relevant work.  (Tr. 17.)

      In step five, the burden is on the Commissioner to establish that the claimant is capable of

performing other work that exists in the national economy.  <u>Yuckert</u>, 482 U.S. at 141-42; 20

Report & Recommendation - 9

C.F.R. §§ 404.1520(f), 416.920(f).  If the Commissioner fails to meet this burden, then the claimant is deemed disabled.

Here, the ALJ did find that Plaintiff had acquired skills from past relevant work as cashier or checker that could transfer to further employment.  For example, Plaintiff could perform this work of checker or cashier with a sit-stand option as described in the Dictionary of Occupational Titles. (Tr. 17.)  However, no specific findings as to skills and occupations were given.

The ALJ determined that there are jobs that exist in significant numbers in  the national economy that Plaintiff can perform.  (Tr. 17-18.)  The VE determined that an individual with Plaintiff's limitations could perform the occupations of cashier I and cashier II.  She explained that there is an array of cashier-checker positions and subclassifications.  (Tr. 18.)  The ALJ determined that Plaintiff has not been under a disability from October 31, 2005, through the date of the decision, November 30, 2007.

## IV.    The Commissioner's Decision Should Be Affirmed

Plaintiff asserts that the ALJ's decision should be reversed and remanded for benefits because it is not supported by substantial evidence and because it is based on the application of improper legal standards.  Plaintiff argues that:

(1)     the ALJ improperly rejected treating physician opinions.

(2)     the ALJ improperly rejected Plaintiff's testimony.

(3)     the ALJ improperly rejected lay witness testimony.

(4)     the ALJ improperly evaluated Plaintiff's mental impairments.

(5)     the ALJ provided an inaccurate RFC and hypothetical question to the VE.

(6)     the ALJ's Step 5 determination is not supported by substantial evidence.

A.      **The ALJ Properly Rejected Plaintiff's Treating Physicians' Opinions**

Plaintiff argues that the ALJ erred when he rejected the opinions of treating physicians

Drs. Jacobs, Knapp, and Monteverdi.

Controlling weight will be given to a treating physician's opinion on the issues of the

nature and severity of a claimant's impairment(s) if the opinion "is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence" in the case record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).   "The

treating physician's opinion is not, however, necessarily conclusive as to either a physical

condition or the ultimate issue of disability." Magallanes v. Bowen, 881 F.2d 747,  751 (9th Cir.

1989) (citing Rodriguez v. Bowen, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)); 20 C.F.R. §§

404.1527(e), 416.927(e); see also Montijo v. Secretary of HHS, 729 F.2d 599, 601 (9th Cir.

1984).

If the ALJ does not find that the treating physician's opinion warrants "controlling

weight," under 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), the ALJ evaluates several factors to

determine the weight to give the opinion.  These include (1) the length of the treatment

relationship and the frequency of the examination, (2) the nature and extent of the treatment

relationship, (3) supportability of the opinion with evidence in the record, (4) consistency of the

opinion with the record on a whole, (5) the specialization of the physician as it relates to the

subject of the opinion, and (6) other factors brought to the ALJ's attention.  20 C.F.R. §

404.1527(d)(2)-(6).

If the ALJ chooses to disregard a treating physician's or an examining physician's

opinion, and that opinion is not contradicted by another doctor, he must set forth clear and

convincing reasons for doing so. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995); <u>Magallanes</u>,

881 F.2d at 751; <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1454 (9th Cir. 1984). If a treating or

examining physician's opinion is contradicted by that of another doctor, the ALJ must set forth

specific and legitimate reasons, based on substantial evidence in the record, for disregarding the

opinion of the treating or examining physician. <u>Lester</u>, 81 F.3d at 830-31; <u>Nguyen v. Chater</u>, 100

F.3d 1462, 1466, (9th Cir. 1996). The ALJ can meet this burden by setting out a detailed and

thorough summary of the facts and conflicting medical evidence, then stating his interpretation,

and lastly making findings. <u>Cotton v. Bowen</u>, 799 F.2d 1403, 1408 (9th Cir. 1986); <u>Rodriguez</u>,

876 F.2d at 762. "The opinion of a nonexamining physician cannot by itself constitute

substantial evidence that justifies the rejection of the opinion of either an examining physician *or*

a treating physician." <u>Lester</u>, 81 F. 3d at 831.

### 1.    Dr. Jacobs

The ALJ rejected Dr. Jacobs's recommendation of disability, and Plaintiff argues several

reasons for error. First, she argues that the ALJ improperly substituted his opinion for Dr.

Jacobs's expert opinion; second, that the ALJ had a duty to expand the record; and third that the

ALJ's conclusion regarding her future visits "misses the point." (Pl.'s Br. 12.)

The court disagrees with Plaintiff's reasons for error. The ALJ has provided clear and

convincing evidence for rejecting Dr. Jacobs's opinion. As he presented in his decision, the ALJ

did not find that Dr. Jacobs's opinion was well-supported by the record, and he found it to be

inconsistent with other evidence in the record. <u>See</u> 20 C.F.R. § 404.1527(d)(2).

The ALJ explained the conflicting medical evidence that led to his conclusion. As the

court explained in <u>Bayliss v. Barnhart</u>, such a contradiction suffices as clear and convincing

evidence: "[s]uch a discrepancy is a clear and convincing reason for not relying on the doctor's opinion regarding Bayliss's limited ability to stand and walk. . . . The ALJ's rejection of Dr. Tobin's opinion is supported by substantial evidence and was based on a permissible determination within the ALJ's province."  427 F.3d 1211, 1216 (9th Cir. 2005).

The ALJ found it inconsistent for Dr. Jacobs to write in the December 27, 2006 letter that he recommended disability but then noted in his examination report, also dated on December 27, 2006, that claimant was "doing reasonably well without any increasing breathlessness or chest pain."  (Tr. 14.)  The ALJ also noted that the post-bronchodilator results that were more positive of Plaintiff's breathing capabilities were not discussed in the letter.  Specifically, her pre-bronchodilator FEV1 reading was 46% of predicted while her post-bronchodilator FEV1 was 72% of predicted.  The ALJ also found it suspect that Plaintiff "did not report deterioration related to her lung condition or other related symptoms at future visits."  (Tr. 14.)  The ALJ has rejected Dr. Jacobs's opinion of Plaintiff's disability because he found it contradictory to the other evidence, and this is entirely within his province as an ALJ.

Further, there was no duty to develop the record.  "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  Mayes v. Massanari, 276 F.3d 453, 459-60, (9th Cir. 2001); citing Tonapetyan v. Halter, 242 F.3d 1444, 1150 (9th Cir. 2001).

Here, Plaintiff argues that the duty is triggered because the ALJ referenced the lack of reported deterioration in Plaintiff's future medical records.  From the decision, it is clear that the ALJ found the lack of deterioration to be evidence of Plaintiff's condition.  His statement does not suggest that the record was inadequate but that Plaintiff's lung condition was not worsening.

Report & Recommendation - 13

(Tr. 14.)

Plaintiff's argument that the ALJ has "miss[ed] the point" is also unpersuasive. She states with no case authority, "[i]t is Dr. Jacobs's opinion that Plaintiff is disabled based on the condition she had at the time of his report. The fact that Plaintiff did not report a deterioration at future visits merely reflects that her disability continued without further deterioration." (Pl.s' Br. 12.) However, as previously discussed, the ALJ's role is to resolve conflicts in the testimony. While the Plaintiff may offer her own interpretation of the medical evidence, so long as the ALJ's interpretation is rational, his will be upheld. Given the discrepancies and contradictions in the record, it was rational for the ALJ to conclude Dr. Jacobs's recommendation disability to be unsubstantiated.

### 2.    Dr. Knapp

The ALJ termed Dr. Knapp's assessment that Plaintiff was unable to work to be "unpersuasive." (Tr. 14.)    Dr. Knapp stated in his November 15, 2006 letter to Plaintiff's attorney: "[Plaintiff] is suffering from severe depression and generalized anxiety disorder, with panic attacks. She also has definite chronic obstructive pulmonary disease or emphysema. She is basically unable to work due to the combination of these issues." (Tr. 307.) Like Dr. Jacobs, he also stated that Plaintiff should qualify for disability. (Tr. 12.)

The ALJ rejected Dr. Knapp's conclusion and noted that Dr. Knapp was not a mental health professional; there were no treating records for emphysema referring to symptoms or clinical findings since May 2007; and Dr. Knapp has not provided any functional restrictions that could be understood to support his belief that Plaintiff is unable to work. (Tr. 14.)    The ALJ concluded, "Dr. Knapp offered no medical rationale for such opinion, nor is there any indication

Report & Recommendation - 14

that he understands the eligibility requirements for establishing entitlement to disability benefits."
(Tr. 13.)

Plaintiff objects to the ALJ's conclusion arguing the ALJ had a duty to develop the record,
he unfairly substituted his opinion for Dr. Knapp's, and he wrongly rejected Dr. Knapp's opinion
because he is not a mental health professional.  (Tr. 14-15.)

The ALJ's reasons for rejecting Dr. Knapp's opinion do not contravene circuit precedent
or SSA regulations, as Plaintiff claims.  She has not shown that the record was inadequate or
ambiguous.  By noting that there were no medical records to support Dr. Knapp's November 15,
2006 letter, the ALJ was explaining how Dr. Knapp's opinion was not supported by the evidence.
See 20 C.F.R. § 404.1527(d)(2).

Further the ALJ was not substituting his opinion for Dr. Knapp's; he was resolving what
he saw as a conflict in the testimony.  He explained that Dr. Knapp's opinion contradicted other
evidence in the record, specifically that x-rays showed Plaintiff's emphysema was clinically
stable in June 2006.  (Tr. 14.)  He stressed that mere speculation of what could happen is not
enough for disability.  He referenced Dr. Knapp's June 2, 2006 letter in which he wrote, "[w]hile
she continued to recover [from a surgical procedure to repair a ruptured area of her lung], she has
been discovered to have several other spots that could do the same thing and require her to have
other treatment."  (Tr. 13; 306.)

Lastly, the ALJ is permitted to evaluate the specialization of the treating professional in
his decision of how much weight to apply to treating physician opinions. 20 C.F.R. §
404.1527(d)(2)-(6).  When a physician treats a claimant for her psychiatric impairment, such as a
prescription for a psychotropic medication, "his opinion constitutes competent psychiatric

Report & Recommendation - 15

evidence and may not be discredited on the ground that he is not a board certified psychiatrist."

Lester, 81 F.3d at 833.

Here, Plaintiff argues the ALJ erred by discrediting Dr. Knapp's opinion because he is not

a mental health specialist.  Dr. Knapp treated Plaintiff for her mental health conditions and

prescribed medication.  (Tr. 224.)  The ALJ did point out that Dr. Knapp is not a mental health

professional in his opinion, but that is not the only reason for rejecting his opinion.  There were

clear and convincing reasons to reject Dr. Knapp's opinion, even excluding the ALJ's improper

comment that he was not a mental health specialist.  The ALJ properly rejected his opinion.

### 3.      Dr. Monteverdi

Dr. Monteverdi concluded in his October 29, 2007 medical source statement that Plaintiff

had moderate limitations in several areas:

> the ability to understand and remember detailed instructions; the ability to
> maintain attention and concentration for extended periods; the ability to maintain
> attention and concentration for extended periods; the ability to interact
> appropriately with the general public or customers; accept instructions and
> respond appropriately to criticism from supervisors; get along with co-workers;
> maintain socially appropriate behavior; and respond to unexpected changes in the
> work place.

(Tr. 16; 343-45.)

The ALJ rejected this opinion because he found no medical rationale from Dr.

Monteverdi explaining the functional limitations.  He completed a check-the-box form but

provided no further explanations. (Tr. 16.)  In Crane v. Shalala, the ALJ rejected the check-the-

box diagnosis because the diagnosis did not include explanations and there was insufficient

evidence of the impairment during the first year of the alleged onset date.  76 F.3d 251, 253 (9th

Cir. 1996).

Report & Recommendation - 16

In rejecting the opinion, the ALJ noted Dr. Monteverdi's short treatment history with Plaintiff.  Plaintiff saw Dr. Monteverdi for the first time in April 2007 and by August 2007 she had requested to cease treatment because of the expense.  It was 2 months after Dr. Monteverdi discontinued care that he completed the assessment at issue here.  Using this as a factor in his conclusion of how to treat Dr. Monteverdi's testimony is consistent with SSA regulations.  See 20 C.F.R. § 404.1527(d)(2)-(6) (noting length of treatment as a factor to determine weight).

Further, the ALJ explained that there were other inconsistencies among the functional limitations, his treatment notes, and the other evidence in the record.  She had a successful work history despite nearly a decade-old bipolar diagnosis.  Her doctors had noted that she responded well to medication, and Dr. Monteverdi assessed that overall the claimant had been stable on Zyprexz and her bipolar disorder was in partial remission.  (Tr. 16.)

The court sees nothing irrational in the ALJ's reliance on these records to base his opinion.  The ALJ properly rejected Dr. Monteverdi's opinion.

### B.      The ALJ Properly Rejected Plaintiff's Testimony

The ALJ found that Plaintiff's credibility was undermined because her testimony of disability was inconsistent with her testimony of daily activities.  Plaintiff disagrees, arguing that her activities and testimony were not inconsistent and her activities do not transfer to a work setting. (Pl.'s Br. 20-21.)

In rejecting the claimant's testimony, the Commissioner must perform a two stage analysis of claimant's evidence.  Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); see also Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986).  First, the ALJ must determine that the claimant has met the threshold test of producing objective medical evidence of an underlying impairment

that could reasonably be expected to produce the pain or other symptoms alleged.  Smolen, 80

F.3d at 1281.  There must be no evidence of malingering.  Id.

Under the second part of the analysis, the Commissioner analyzes the credibility of the

claimant's testimony regarding the severity of claimant's symptoms.  Smolen, 80 F.3d at 1281.

The Commissioner can reject a claimant's symptom testimony only if he provides clear and

convincing reasons for doing so and makes specific findings.  Dodrill v. Shalala, 12 F.3d 915,

918 (9th Cir. 1993).  General findings are insufficient; rather, the ALJ must identify what

testimony is not credible and what evidence suggests that the testimony is not credible.  Reddick

v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  The Commissioner cannot reject a claimant's

symptom testimony solely because it is not fully corroborated by objective medical findings.

Cotton, 799 F.2d 1403.

> In determining a claimant's credibility the Commissioner may consider
>
> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. . . .  In evaluating the credibility of the symptom testimony, the ALJ must also consider the factors set out in SSR 88-13. . . .  Those factors include the claimant's work record and observations of treating and examining physicians and other third parties regarding, among other matters, the nature, onset, duration, and frequency of the claimant's symptoms; precipitating and aggravating factors; functional restrictions caused by the symptoms; and the claimant's daily activities.

Smolen, 80 F.3d at 1284.

While a claimant need not be "utterly incapacitated to be eligible for benefits," Fair v.

Bowen, 885 F.2d 597, 603 (9th Cir. 1989), daily activities may undermine her credibility.  The

Ninth Circuit has recognized two instances in which daily activities played a role in the

Report & Recommendation - 18

credibility determination: (1) when the claimant is able to spend a substantial part of her day engaging in activities that involve physical functions that are transferrable to a work setting or (2) when the testimony about daily activities contradicts other testimony. Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007).

The Ninth Circuit explained that the ALJ must identify "what testimony is not credible and what evidence undermines the claimant's complaints." Lester, 81 F.3d at 834. Once that determination is made, the court defers to the ALJ. "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). "When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ." Batson v. Barnhart, 359 F.3d 1190, 1195 (9th Cir. 2004).

In Rollins v. Massanari, the court found that the ALJ had provided clear and convincing evidence to reject the claimant's testimony. He noted the inconsistencies between the testimony and daily activities, and explained how the plaintiff's claim "to have totally disabling pain was undermined by her own testimony about her daily activities, such as attending to the needs of her two young children, cooking, housekeeping, laundry, shopping, attending therapy and various other meetings every week, and so forth." 261 F.3d 853, 857 (9th Cir. 2001). The court ultimately deferred to the ALJ: "the ALJ's interpretation of [plaintiff's] testimony may not be the only reasonable one. But, it is still a reasonable interpretation and is supported by substantial evidence; thus it is not our role to second-guess it." Id. (citing Fair, 885 F.2d at 604).

Here, Plaintiff alleges disability based on emphysema, depression, stress, collapsed lung, and chronic obstructive pulmonary disease (COPD). (Tr. 124.) She claimed that these

Report & Recommendation - 19

conditions precluded her from working: "[I] cannot stand for any length of time, my ability to breath[e] is poor. I can't lift anything more than few pounds, my depression makes it difficult to deal with people." (Tr. 124.) However, Plaintiff also testified that she practices with a band three times a week to exercise her lungs. She also shops occasionally with her husband and does some housework and cooking. (Tr. 12.)

The ALJ concluded that her activities were inconsistent with her testimony. Specifically, it is inconsistent for Plaintiff to assert that she is unable to stand for any period of time and yet practice with a band three times a week. (Tr. 16.) Plaintiff argues that her activities do not show that she is able to work. She qualifies that singing exercises her lungs and she takes many breaks through the rehearsals. (Tr. 57.) She points out that her husband testified that after her lung injury she has problems with endurance and needs to rest every ten or fifteen minutes to avoid getting sore. (Pl.'s Br. 4.)

There is evidence on both sides of the credibility issue. The court can see why the ALJ found Plaintiff's daily activities to be inconsistent with her testimony. In this case, as in Rollins discussed above, there may be more than one rational interpretation. See 261 F.3d at 857. The ALJ's conclusion that "her credibility is undermined by the fact that she engages regularly in singing and participation in a band on average three times a week" (tr. 16) is rational, and the court defers to the ALJ.

### C.    The ALJ Properly Rejected Lay Witness Testimony

Plaintiff argues that the ALJ erred by not including lay witness Mr. Keyser's limitations into the RFC. Defendant asserts that these limitations were properly rejected.

The Commissioner will consider non-medical sources to evaluate the severity of the

Report & Recommendation - 20

impairment, such as testimony from spouses and other family members.  20 C.F.R. §

404.1513(d)(4).

> When the claimant indicates that pain is a significant factor of his/her alleged
> inability to work, and the allegation is not supported by objective medical
> evidence in the file, the adjudicator shall obtain detailed descriptions of daily
> activities by directing specific inquiries about the pain and its effects to the
> claimant, his/her physicians from whom medical evidence is being requested, and
> other third parties who would be likely to have such knowledge.

SSR 88-13 at *3.

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take

into account, unless he or she expressly determines to disregard such testimony and gives reasons

germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001) (citing

Nguyen, 100 F.3d at 1467.  In evaluating lay witness opinions, "it would be appropriate to

consider such factors as the nature and extent of the relationship, whether the evidence is

consistent with other evidence, and any other factors that tend to support or refute the evidence."

SSR 06-03p at *6.

In Greger v. Barnhart, the court affirmed the ALJ's decision to reject lay witness

testimony.  The ALJ concluded that the witness statements were inconsistent with claimant's

presentations to his doctors and noted the witness's "close relationship," which may have

influenced her desire to help the claimant. The court concluded, "[t]he ALJ's reasons for doubting

[the witness's] credibility are germane to her; accordingly, it was not error for the ALJ to

disregard her testimony."  464 F.3d 968, 972 (9th Cir. 2006).

Here, the ALJ concluded, "Mr. Keyser's reporting is credible but does not change the

conclusion that the claimant is capable of returning to work."  (Tr. 17.) In coming to his decision,

Report & Recommendation - 21

the ALJ explained that medical records did not support the claim that her conditions precluded work. He referenced medical records that show her lung condition was stable and that she was able to work. (Tr. 15-17.)

Plaintiff argued that "[b]ecause the ALJ found Mr. Keyser's testimony to be credible, the limitations he identified should have been incorporated into the ALJ's RFC finding." (Pl.'s Reply 7.) However, just because the ALJ believes the witness to be honest and truthful does not make the witness's testimony competent evidence.

The ALJ may evaluate several factors, one of which is whether the evidence is consistent with other evidence. See SSR 06-03p at *6. As previously discussed, the ALJ found that Plaintiff's daily activities were inconsistent with her claimed abilities. Mr. Keyser's testimony that his wife is "horizontal" or on her back 90% of the time is also inconsistent with her activities and the medical evidence. (Tr. 57.) See Part IV.A.

The ALJ gave germane reasons for rejecting Mr. Keyser's testimony. There was no error.

### D.    The ALJ Properly Evaluated Plaintiff's Mental Impairments

Plaintiff argues that the ALJ's decision regarding her mental impairments is in error. First, she argues that the ALJ did not follow the appropriate procedures in assessing her mental impairment. Second, she argues that the ALJ did not properly consider whether her impairments or combined impairments meet or medically equal one of the listed impairments. (Pl.'s Br. 9.)

#### 1.    Plaintiff's Mental Impairments

An ALJ must follow the technique set out in 20 C.F.R. § 404.1520a to evaluate the severity of a mental impairment. The degree of functional limitation is rated in four areas: activities of daily living; social functioning; concentration, persistence and pace; and episodes of

decompensation. 20 C.F.R. § 404.1520a(c)(3). SSA regulations explain,

> the written decision must incorporate the pertinent findings and conclusions based
> on the technique. The decision must show the significant history, including
> examination and laboratory findings and the functional limitations that were
> considered in reaching a conclusion about the severity of the mental impairments.

20 C.F.R. § 404.1520a(e)(2).

Plaintiff argues that the ALJ's step two finding is in error because the ALJ did not

following this technique. First, Plaintiff argues there is error because the ALJ did not mention or

discuss the four broad functional areas and instead only provided a summary. (Pl.'s Br. 8.)

Second, she essentially argues that it was in error to use the state agency assessment as a basis for

this opinion because it pre-dates other available mental health records. (Pl.'s Br. 8.) Lastly, she

finds fault with the ALJ's purported standard of a "longitudinal history documenting significant

limitations on her ability to work caused by the bipolar disorder." (Tr. 11).

Though the ALJ did not detail his ratings of the four functional areas in his findings, he

sufficiently addressed the ratings by incorporating by reference the state agency medical

consultant's assessment. The ALJ explained, "while the claimant's bipolar disorder is a medically

determinable impairment, it is not severe. Such was the conclusion of the state agency medical

consultant Frank Lathan, PhD on February 24, 2006, as found in the psychiatric review technique

form." (Tr. 10.) Dr. Latham assessed mild limitations in activities; mild difficulties in

maintaining social functioning; mild difficulties in maintaining concentration, persistence, and

pace; and no episodes of decompensation. (Tr. 275.) These findings do not meet or equal the

listings for a severe impairment.

Plaintiff argues that the ALJ's "rote recitation fails to comply with the regulatory

Report & Recommendation - 23

requirement that the ALJ's decision must 'show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).'" (Pl.'s Reply 9; citing 20 C.F.R. § 404.1520a(e)(2).)

The court disagrees. The ALJ did not solely rely on the medical assessment of Dr. Latham. He incorporated the assessment into his findings, stated that he agreed with it, and he detailed other medical evidence in his decision to support his conclusion. The ALJ reported that Dr. Monteverdi assessed that Plaintiff did not have profound episodes of depression, that she improved on medication, and that she had maintained stable on medication. Dr. Monteverdi also confirmed that her bipolar disorder was in partial remission. (Tr. 15; 321.)

Plaintiff's claim that the ALJ hastily determined her mental impairment was non-severe because he relied on teh February 2007 assessment is also untrue and unsupported. In his decision, the ALJ clearly summarizes and references medical records spanning the time from her alleged disability up to the hearing. See Lombardo v. Schweiker, 749 F.2d 565, 567 (9th Cir. 1984) (noting that the ALJ's summaries of claimant's physicians' reports indicated the ALJ had thoroughly considered the combined effects). He gave several reasons for his conclusion of a non-severe impairment that rely on medical evidence throughout the period in question. Notably, in August 2007, she was responding well to medication (tr. 15;323) and had successfully maintained employment over the past 15 years after her first diagnosis of bipolar disorder. (Tr. 10.) Moreover, Dr. Monteverdi's treatment records note that her bipolar disorder was in partial remission, only a few months prior tot he ALJ's decision. (Tr. 15; 321.)

The ALJ did not apply the legal standard of "longitudinal history" as the Plaintiff claims.

Report & Recommendation - 24

He commented, "the undersigned agrees . . . that her mental condition is not severe, as there is an absence of longitudinal history documenting any significant limitations on her ability to work caused by the bipolar disorder." (Tr. 11.)

As Defendant explained, the ALJ was not applying this as a standard but highlighting evidence that supported his decision. "[T]he absence of a longitudinal history documenting any significant limitations was simply further evidence that Plaintiff's bipolar disorder did not prevent Plaintiff from performing substantial gainful activity for a continuous period of twelve months." (Def.'s Br. 18; citing 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1509.) The SSA regulations explain that the ALJ's decision must include significant history that was considered in reaching the determination, and by noting the *absence* of history, the ALJ was following the regulations. See 20 C.F.R. § 404.1520a(e)(2).

The ALJ's determination that Plaintiff's bipolar disorder was not a severe impairment is supported by substantial evidence.

### 2.    Plaintiff's Combined Impairments

At step three, the ALJ must determine if the impairments or combination of impairments meets or equals in severity one of the listed impairments. 20 C.F.R. § 404.1520(a)(4)(iii); Lester 81 F.3d at 829-30; 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing).

In evaluating the equivalency of the combined impairments with those in the Listing, the ALJ "is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." Burch v. Barnhart, 400 F.3d 676, 683 (2005). In Marcia v. Sullivan, the Ninth Circuit explained, "We hold, that in determining whether a claimant equals a

Report & Recommendation - 25

listing under Step 3 . . . , the ALJ must explain adequately his evaluation of alternative tests and the combined effects of the impairments." 900 F.2d 172, 176 (9th Cir. 1990.) However, this evaluation need not be in the ALJ's "Findings" section. The court in <u>Lewis</u> clarified that the holding in <u>Marcia</u> "simply requires an ALJ to discuss and evaluate the evidence that supports his or her conclusion; it does not specify that the ALJ must do so under the heading of 'Findings.'" 236 F.3d at 513.

Plaintiff contends that the ALJ did not properly consider her combined impairments. She argues that the ALJ "did little more tha[n] simply make the conclusory finding" (Pl.'s Br. 8) and then failed to mention her mental impairments. (Pl.'s Br. 9.) In her brief, Plaintiff suggests that the "ALJ might have found" impairments equal to Listings 12.04, 12.04, 12.06, or another Listing. (Pl.'s Br. 10.) However, Plaintiff provides no support for her hypothesis of what the ALJ might have found.

Defendant argues there is no error in the ALJ's analysis because Plaintiff did not present evidence to establish equivalence. (Def.'s Br. 18.) "Plaintiff did not present evidence of equivalence to the ALJ and does not argue with specificity . . . how her impairments would equal a listing." (Def.'s Br. 19.)

The court agrees with Defendant. Though Plaintiff has provided her theory as to what the ALJ might have found, this is not evidence. Further, her theory is based on Dr. Monteverdi's functional assessment that the ALJ did not adopt. There was no error in the ALJ's analysis of her combined impairments.

### E.    RFC Determination and Corresponding Hypothetical Were Not in Error

Plaintiff argues that the ALJ's RFC was in error because it did not include limitations lay

witness Mr. Keyser described, and thus she argues the hypothetical based on the RFC was also inaccurate.

Where opinion evidence is properly discounted, the ALJ is not required to include it in the RFC finding. Batson, 359 F.3d at 1197. As previously discussed, the ALJ properly discredited his testimony. Accordingly, the ALJ was not required to include these limitations in his RFC or hypothetical.

### F.    Step Five Determination Was Not in Error

Plaintiff argues the ALJ erred at step five because he failed to comply with SSA regulations about making findings of transferability of skills. (Pl.'s Br. 23.) She also argues that there are not jobs that exist in the national economy in significant number to justify his determination of not disabled. (Pl.'s Br. 24.)

When a decision involves a transferability of skills, the ALJ is required to make certain findings of fact and include them in the decision. SSR 82-41 at *7. "When a finding is made that a claimant has transferable skills, the acquired work skills must be identified, and specific occupations to which acquired work skills are transferrable must be cited in the . . . ALJ's decision." Id.

The ALJ found that the Plaintiff had acquired work skills from past relevant work. "The vocational expert testified that the claimant's past relevant work as cashier or checker was semi-skilled with a specific vocational preparation (SVP) code of three, and she would be able to perform a cashier or checker existing within the national economy and as described by the DOT." (Tr. 17.) However, the ALJ did not adequately identify the acquired work skills or specific occupations.

Report & Recommendation - 27

Defendant concedes that failing to identify the transferrable skills is reversible error. However, he also argues that the decision is saved because the ALJ also found that Plaintiff could perform the unskilled representative occupations of cashier II. (Def.'s Br. 20.) The VE testified that Plaintiff would be able to perform positions of cashier I and cashier II. The position of cashier II is "unskilled, simple and routine per the DOT" and does not require Plaintiff's allegedly transferred skills.

The VE testified that in the state of Oregon, there are 43,000 cashiers, and in the national economy there are 1.2 million. (Tr. 63.) Because Plaintiff needs a sit/stand option because of her RFC, the VE narrowed the range to 12,696 positions. The VE also explained that cashier positions specifically limited to receiving payments, ticketing or ticketing selling number at 6,820. (Tr. 64.)

As Defendant acknowledges, there is no bright line test for what qualifies as a "significant number" at step five. Several circuits have found a "significant number" where there are far fewer than 12,000 positions. In Martinez v. Heckler, 807 F.2d 771, 775 (9th Cir.1986), the court upheld the ALJ's finding that 3,750 to 4,250 jobs were a significant number. The Sixth Circuit has found that 1,350 jobs in the local economy constituted a significant number. Hall v. Bowen, 837 F.2d 272, 275 (6th Cir.1988). The Eighth Circuit has held that as few as 500 jobs were a significant number. Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir.1988).

Here, there are over 12,000 jobs in the state economy that Plaintiff could perform. This is substantial evidence that the ALJ could rely upon. His decision was not improper.

**V.     Conclusion**

The ALJ's decision was based on substantial evidence. In his decision, the ALJ properly

Report & Recommendation - 28

rejected physician, plaintiff, and lay witness testimony. He properly evaluated her mental impairments and provided an accurate RFC and hypothetical. There are over 12,000 jobs in the state economy that Plaintiff can perform. The ALJ's decision should be affirmed.

## VI.    Recommendation

Based on the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be affirmed.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals*. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. *Objections to this Report and Recommendation, if any, are due by February 26, 2010. If objections are filed, any response to the objections are due within 17 days of service of the objections, see* Federal Rules of Civil Procedure 72 and 6.

Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

DATED this __7__ day of February, 2010.

_____
MARK D. CLARKE
United States Magistrate Judge

Report & Recommendation - 29